**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**2014 MSPB 90**

Docket No. CB-0752-15-0112-I-1[1]

**Prouty & Weller,**

**Appellants,**

**v.**

**General Services Administration,**

**Agency.**

December 24, 2014

Debra L. Roth, Esquire, Julia H. Perkins, Esquire, and William L. Bransford, Esquire, Washington, D.C., for appellant Prouty.

Alan L. Lescht, Esquire, Washington, D.C., for appellant Weller.

Floyd Allen Phaup, II, Esquire, and Sara Ryan, Esquire, Washington, D.C., for the agency.

Ann F. MacMurray, Denver, Colorado, for the agency.

**BEFORE**

Susan Tsui Grundmann, Chairman
Anne M. Wagner, Vice Chairman
Mark A. Robbins, Member

---

[1] This matter is a consolidation of two cases, *Paul Prouty v. General Services Administration*, MSPB Docket No. DE-0752-12-0396-I-1, and *James Weller v. General Services Administration*, MSPB Docket No. DA-0752-12-0519 I-1. As explained more fully below, the Board has consolidated these matters pursuant to 5 C.F.R. 1201.36(a)(1), (b) under the instant docket number.

**OPINION AND ORDER**

¶1     These cases are before the Board on the General Services Administration's (the agency or GSA) petitions for review from the initial decisions which, in both cases, reversed the appellants' removals.  We have consolidated these cases under MSPB Docket No. CB-0752-15-0112-I-1 because we have determined that doing so will expedite their processing and not adversely affect the parties' interests. 5 C.F.R. § 1201.36(a)(1), (b).  For the reasons set forth below, we AFFIRM the initial decisions as MODIFIED.  Both removals are REVERSED.

BACKGROUND

¶2     Before discussing the particular facts of these cases, it is necessary to briefly explain the undisputed and widely reported context in which they arose. In 2010, the agency hosted the Public Buildings Service' (PBS) Western Regional Conference (2010 WRC), an extravagant, $823,000 conference, in Las Vegas, Nevada.   In December 2010, after hearing concerns about possible excessive spending and employee misconduct in connection with the 2010 WRC, the agency's Deputy Administrator contacted the Office of Inspector General (OIG). Following an investigation, on April 2, 2012, the OIG issued a Management Deficiency Report on documented waste and abuse at the 2010 WRC.  The report found that a series of significant irregularities had occurred and concluded that the agency violated federal limits on conference spending.  MSPB Docket No. DE-0752-12-0396-I-1, Initial Appeal File (Prouty IAF), Tab 16 at 60-62, 68-90.[2]  Specifically, the OIG found that:  (1) "spending on conference planning was excessive, wasteful, and in some cases impermissible"; (2) the agency "failed to follow contracting regulations in many of the procurements associated with the WRC and wasted taxpayer dollars"; (3) the agency "incurred excessive and

_____

[2] Where the documents are identical, we have cited only to the Prouty file.

impermissible costs for food at the WRC"; (4) the agency "incurred impermissible and questionable miscellaneous expenses;" and (5) the agency's "approach to the conference indicates that minimizing expenses was not a goal." *Id.* at 71-72. The OIG found essentially that responsibility for the associated questionable spending, contracting, and procurement activities lay with the Region 9 Commissioner and Region 9 staff, who had been assigned responsibility for the hosting activities and management of funds for the 2010 WRC. The report produced an understandable national firestorm of reaction, sparking a congressional investigation into wasteful government spending and hearings by several congressional committees. The public reaction led to the resignation of GSA Administrator Martha N. Johnson and the firing of two of her top political deputies. In her resignation letter, Administrator Johnson admitted that a "significant misstep" had occurred and that taxpayers' money had been "squandered." In addition, the Region 9 Commissioner's second-line supervisor, the PBS Commissioner, was summarily dismissed from his position. And, after the Region 9 Commissioner himself, who was also the Acting Administrator for GSA's PBS, Pacific Rim Region, resigned, a federal grand jury indicted him on charges of fraud and filing false claims for personal reimbursement.

¶3 Appellant Prouty was the Regional Commissioner of the Rocky Mountain Region, Region 8, with the PBS, and appellant Weller was the Regional Commissioner of the Greater Southwest Region, Region 7. On April 19, 2012, the Acting Commissioner, PBS, proposed that the appellants be removed under 5 U.S.C. § 7543[3] for "Conduct Unbecoming a Federal Employee" based on four specifications and premised on the deficiency report. The agency asserted, as to each specification, that the appellants knew or should have known of the following improprieties: (1) that the number of planning meetings for the

---

[3] Under 5 U.S.C. § 7543, a member of the Senior Executive Service (SES) may be removed or suspended only for "misconduct, neglect of duty, or malfeasance."

2010 WRC and the number of participants at those meetings were excessive and improper; (2) that the money spent on food and beverages was excessive or constituted impermissible spending; (3) that spending on clothing and "conference mementos" was impermissible; and (4) that, with regard to a team building exercise, the appellants acquiesced to excessive spending that was wasteful.  Prouty IAF, Tab 16 at 60; MSPB Docket No. DA-0752-12-0519-I-1, Initial Appeal File (Weller IAF), Tab 5 at 49.  After considering the appellants' replies, the GSA Deputy Administrator issued decisions on June 22, 2012, finding the charge sustained and warranting the appellants' removals, effective June 25, 2012.  Prouty IAF, Tab 16 at 23; Weller IAF, Tab 5 at 13.

¶4        Following lengthy separate hearings, two different administrative judges issued initial decisions reversing the removal actions after determining that the agency failed to establish any of the specifications underlying the charge.  Prouty IAF, Tab 48, Initial Decision (Prouty ID) at 1, 41; Weller IAF, Tab 38, Initial Decision (Weller ID).  As to the first specification, the administrative judge in the *Prouty* case found that the agency failed to establish that appellant Prouty "had directed or had knowledge of and acquiesced in the misconduct" alleged regarding meetings in 2009, during a period when he was detailed to the position of Acting Administrator of GSA, noting that there were several levels of supervisors, including SES members, between appellant Prouty and the meeting attendees and that travel and budget authorities were delegated to each region.  The administrative judge concluded that, given appellant Prouty's higher level in the supervisory chain of command, he had no reason to know the details of the meetings and travel activities, as that obligation belonged to supervisors at the regional level.  Prouty ID at 30.  As to the 2010 planning meetings, which occurred after appellant Prouty returned from detail to his position as Regional Commissioner of Region 8, the administrative judge found that the OIG report

showed that only two Region 8 employees attended pre-planning meetings. Finding no evidence in the record of the actual costs and expenses[4] for the attendance by two Region 8 employees to these meetings, the administrative judge determined that the agency failed to establish that the expenses were excessive. Prouty ID at 30. Next, the administrative judge found that the agency failed to establish that the expenses for six Region 8 employees who attended a "dry run" of the conference were unreasonable or excessive. The administrative judge noted that four of those employees made presentations at the 2010 WRC, that it was uncontroverted that the dry runs were considered necessary and essential to insure quality presentations and had been agency practice for several years, and that the agency had failed to submit any evidence as to the actual costs and expenses for these employees' attendance at the dry run.[5] The administrative judge also determined that the agency failed to establish that appellant Prouty should have called the excessive number of planning meetings and attending employees to the attention of his peers. Prouty ID at 31. The administrative judge concluded that the agency failed to show that appellant Prouty knew or should have known about the number of planning meetings in 2009 and 2010, that these meetings were within the authority of Region 9 to organize and convene, and that appellant Prouty did not have direct control over the Regional Commissioner of Region 9 or its employees to trigger an affirmative duty to investigate. Prouty ID at 32. Finally, the administrative judge considered the agency's allegation that appellant Prouty's partial attendance at a March 2010 pre-planning meeting established his knowledge of the allegedly excessive

---

[4] It is undisputed that, except for a few discrete receipts and costs summaries, the agency failed to submit into the record most of the evidence underlying the OIG's conclusions. Prouty ID at 28.

[5] The administrative judge noted that appellant Prouty did not attend the "dry run" due to a business conflict and that, in fact, he did not attend the 2010 WRC because of a family obligation. Prouty ID at 16.

expenditures or created an obligation to ensure that all expenses were appropriate. The administrative judge concluded that the agency failed to establish that, by attending this meeting, appellant Prouty knew of Region 9's plans to spend funds inappropriately or beyond what was allocated for the WRC. Prouty ID at 32-33. The administrative judge concluded that, because appellant Prouty did not have any direct control over Region 9 employees triggering an affirmative duty to investigate, the agency failed to establish that he had directed or had knowledge of and acquiesced in the misconduct of Region 9 employees. Prouty ID at 33.

¶5    As to the second specification, the administrative judge determined that the agency failed to prove that appellant Prouty knew or should have known that the money spent on food and beverages at the 2010 WRC was excessive or constituted impermissible spending, noting that the record is devoid of any evidence that he or any employee from Region 8 was involved in procuring food for the conference or had knowledge of the procurement contracts entered into by Region 9. Prouty ID at 33. The administrative judge noted that the agency had delegated authority for procurement and contracting to each region and concluded that the agency failed to provide any evidence that appellant Prouty should have known that the Regional Commissioner of Region 9 was not exercising his delegated authorities in accordance with applicable laws, rules, or regulations. Prouty ID at 33-34.

¶6    As to the third specification, the administrative judge found that, except for an expenditure on commemorative coins and velvet boxes given to all conference participants, the record was devoid of any evidence that appellant Prouty had any actual knowledge about any expenditure identified in specification 3. Prouty ID at 34. In this regard, the administrative judge noted that appellant Prouty had advised the OIG that, although "he was aware that coins were given to people at the conference as recognition and were related to all the hard work [they] performed," he was not aware of any other recognition or awards during the

conference.  Prouty IAF, Tab 16 at 93.  The administrative judge found no evidence that a Region 8 contractor who participated in the planning played a role in the procurement decisions or in the expenditure of the funds, or that appellant Prouty was advised by Region 9 of these expenses.  Prouty ID at 34-35.  The administrative judge further found that the contractor's hearing testimony was credible and consistent with other evidence showing the delegation of contracting and procurement authority to Region 9.  Prouty ID at 15.  The administrative judge noted that the evidentiary basis for the agency's claim that the coins were inappropriate was a single paragraph finding in the OIG deficiency report, which stated:

> GSA spent $6,325 on commemorative coins "rewarding" all conference participants (as well as all regional employees who did not attend the conference) for their work on Recovery Act projects, along with velvet boxes to hold the coins.  These did not qualify as permissible awards because the coins' design . . . shows that they were intended to be mementos of the WRC.

Prouty ID at 36; *see* Prouty IAF, Tab 16 at 82.[6]  The administrative judge found that the use of coins as commemoratives was not permissible, Prouty ID at 35; *see* Prouty IAF, Tabs 39, 41, but she credited the hearing testimony of appellant Prouty, appellant Weller, and the Regional Commissioner of Region 10 that the purpose of the coins was to recognize the outstanding performance of the employees in Regions 7, 8, 9 and 10 for their efforts in timely committing Recovery Act funds while also continuing regular ongoing business, Prouty ID at 36-37, *see* Prouty Hearing Transcript (HT), Volume (Vol.) 8 at 75-76, Vol. 9 at 10-11, 51-52.  Assigning this testimonial evidence greater probative weight than the summary, unsworn, hearsay conclusions submitted in the OIG report, the administrative judge found that the coins were issued to recognize the employees' performance and were not merely impermissible mementos.  Prouty ID at 36-37.

---

[6] The OIG report contains no affidavits or other sworn testimony regarding the coins.

Accordingly, the administrative judge concluded that the agency failed to prove this element of specification 3 and, in turn, failed to prove that specification by a preponderance of the evidence. Prouty ID at 37.

¶7 As to the fourth specification, the administrative judge determined that the agency submitted insufficient evidence to prove actionable misconduct by appellant Prouty. Prouty ID at 38. Specifically, she found the record to be devoid of any evidence that appellant Prouty knew that Region 9 engaged in improper procurement and contracting activities, noting that, as of the date of the March 2010 planning meeting, no procurements had yet occurred for team building activities.[7] Prouty ID at 37.

¶8 Similarly, the administrative judge in the *Weller* case found, as to the first specification, that although the agency alleged in this specification that appellant Weller had failed to control costs by permitting 70 employees from his region to attend the WRC, it provided no evidence or explanation as to why this number of conference attendees should be deemed untoward or excessive. Weller ID at 3. The administrative judge determined that documentation produced as part of the OIG report supported the agency's conclusion that the decision to convene such a series of onsite meetings was made with little regard for any notion of reasonable cost management but that the agency failed to offer any evidence to establish that appellant Weller was actually responsible for that decision. Weller ID at 4-5. Rather, the administrative judge concluded that, outside of his personal appearance at the final "dry run" meeting for the WRC, the evidence established that appellant Weller possessed no knowledge regarding the WRC planning meetings until well after the fact, and thus was not in a position to contest or

_____

[7] The administrative judge considered appellant's Prouty's claim of denial of due process but found that he did not establish it. Prouty ID at 39-41. That finding has not been challenged on review, and therefore we do not address it here.

otherwise limit the travel costs associated with their frequency and composition. Weller ID at 6.

¶9    Further, as the administrative judge noted, appellant Weller testified that, when his region had hosted past conferences, he used procedures to ensure compliance with applicable rules and regulations, and he therefore had reason to believe the same held true for Region 9 with respect to the 2010 WRC. Weller ID at 6; *see* Weller HT, Vol. II at 33-35, 115. The administrative judge determined that the consistent testimony of the hearing witnesses established that Region 9, as the host region for the WRC, was responsible for the logistics of conference planning, with input from nonhost regions being limited to the content of the conference itself. Weller ID at 6. He found no evidence that appellant Weller knew or should have known about the meetings or their composition or that he played any role in arranging the attendance for the "dry run," or knew what attendance would be before the fact. Weller ID at 7. Based on this record, the administrative judge concluded that it was not possible for appellant Weller to have controlled the excess costs associated with these events by calling them to the attention of his peers. Weller ID at 7-8.

¶10    Regarding the second specification, the administrative judge found the record devoid of any evidence that appellant Weller was involved in procuring food for the conference or had knowledge of the procurement contracts entered into by Region 9. The administrative judge found that the contract arrangements for the food and beverages served at the WRC were exclusively performed by employees of Region 9, that appellant Weller was not privy to this contracting process, and that he did not know what the government was actually charged for any of the catering arrangements at the WRC. Weller ID at 9. The administrative judge concluded that appellant Weller did not participate in the relevant purchasing decisions and had no prior notice of the resulting largesse, until actually partaking of it along with other conference attendees. But even had appellant Weller reacted at that point, the administrative judge concluded, it was

then too late for him to have "stopped these irregularities," as the agency charged he should have done. Weller ID at 11-12.

¶11     As to the third specification, the administrative judge determined that it was the understanding of all involved that contract and procurement decisions for the WRC were to be made by Region 9, which remained solely responsible for them, and that, apart from the purchase of the commemorative coins, the agency failed to establish that appellant Weller either knew or had reason to know of the particular procurement decisions cited in this specification, prior to his attendance at the conference itself. Weller ID at 13-15. The administrative judge considered the same single paragraph in the OIG deficiency report as did the administrative judge in the Prouty case, crediting the hearing testimony of appellant Weller, appellant Prouty, and the Regional Commissioner of Region 10 that the purpose of the coins was to recognize the outstanding performance of the employees in Regions 7, 8, 9 and 10 for their efforts in timely committing Recovery Act funds while also continuing regular ongoing business. Weller ID at 15-16, *see* Weller HT, Vol. I at 262-66, 330-32, Vol. II at 90. The administrative judge concluded that the record, taken as a whole, did not support a finding that appellant Weller's actions with regard to the issuance of the coins in question constituted conduct unbecoming a federal employee. Weller ID at 17.

¶12     And, as to the fourth specification, the administrative judge found that the record did not demonstrate that appellant Weller knew or had reason to know that excessive government funds were being expended on a $75,000 "team-building" bicycle exercise or that the exercise would result in the improper donation of agency property (the agency purchased 25 bicycles for the exercise and later donated them to a local boys and girls' club, in contravention of federal rules).[8] Weller ID at 20.

---

[8] The administrative judge considered appellant Weller's claims of denial of due process and harmful error but found that he did not establish either. Weller ID

¶13     The agency has filed petitions for review of the initial decisions, and the appellants have filed responses in opposition to the agency's petitions. MSPB Docket No. DE-0752-12-0396-I-1, Petition for Review (Prouty PFR) File, Tabs 1, 3; MSPB Docket No. DA-0752-12-0519-I-1 (Weller PFR) File, Tabs 1, 3.

## ANALYSIS

¶14     On review, the agency contends that the administrative judge in the *Prouty* case erred by mischaracterizing its charge of conduct unbecoming as a charge of failure to supervise subordinates and by analyzing the underlying specifications of the charge using the standard set forth in *Miller v. Department of Health & Human Services*, 8 M.S.P.R. 249 (1981). Prouty PFR File, Tab 1 at 13. Similarly, the agency contends that both administrative judges erred by holding that the appellants had no duty to investigate and be informed about the activities of their peers and that, for members of the SES,[9] the Board should require a "heightened duty to investigate and inquire," an obligation that extends beyond "merely supervising direct reports." Prouty PFR File, Tab 1 at 14-16; Weller PFR File, Tab 1 at 4-5.

¶15     As we recently pointed out in *Powell* v. *U.S. Postal Service*, 2014 MSPB 89, the Board in *Miller* determined that a supervisor cannot be held responsible for the improprieties of subordinate employees unless he actually directed or had knowledge of and acquiesced in the misconduct. *See Miller*, 8 M.S.P.R. at 252. In applying the "knowledge and acquiescence" standard, the Board in *Miller* considered the following factors: (1) the knowledge the supervisor has, or should have, of the conduct of subordinates; (2) the existence of policies or practices

---

at 26-28. That finding was not challenged on review, and we therefore do not address it here.

[9] The SES was created by the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111, "to ensure that the executive management of the Government of the United States is responsive to the needs, policies, and goals of the Nation and otherwise is of the highest quality." 5 U.S.C. § 3131.

within the supervisor's agency or division which relate to the offending conduct; and (3) the extent to which the supervisor has encouraged or acquiesced in these practices and/or the subordinates' misconduct. *Id.* at 252-53. The Board stated in *Miller* that, "[t]he greater the duty a supervisor has to control those employees who actually committed the improprieties, the less specific knowledge of the misconduct the supervisor will be required to have. Where it has been shown that the supervisor has direct control over the employees committing the violation, the supervisor's general knowledge of relevant factors imposes an affirmative duty to investigate further." *Id.* at 253.

¶16        We first note that, importantly, neither notice of proposed removal alleges that the appellants engaged in misconduct because of a failure to perform a heightened duty to investigate and inquire. *See* Prouty IAF, Tab 16 at 59-63. As the administrative judge in *Prouty* correctly determined, there are two parts to each specification—that the appellant in fact knew of the "questionable and excessive expenditures" in connection with the WRC and thus engaged in misconduct personal to him, or that he should have known about "the questionable and excessive expenditures" and acted to prevent them from occurring. Prouty ID at 27; *see* Prouty IAF, Tab 16 at 60-62. The Board is required to review the agency's decision on an adverse action solely on the grounds invoked by the agency; the Board may not substitute on its own what it considers to be a more adequate or proper basis. *Gottlieb v. Veterans Administration*, 39 M.S.P.R. 606, 609 (1989). We therefore may not consider in the context of these appeals whether the appellants' status as members of the SES lessens or otherwise affects the agency's burden of proving the specific allegations in its misconduct charge.

¶17        Second, the agency contends that the administrative judges failed to consider its position that the appellants should have known about the questionable and excessive expenditures *because* they had an affirmative duty to inquire and investigate. This assertion, that the administrative judges did not

adequately consider this argument, is inaccurate. In fact, for each of the specifications, the administrative judges first thoroughly reviewed the record evidence to determine whether the agency established its allegation that the appellants in fact knew of the activities at issue and then considered whether the agency established that the appellants should have known of the alleged misconduct. *See* Prouty ID at 24-38; *see also* Weller ID at 3-20. In so proceeding, the administrative judge in *Prouty* specifically considered the agency's arguments, taking into consideration that the SES is a corps of elite federal managers held to a very high standard of conduct, and, in each instance, she determined that the agency failed to establish that an affirmative duty to investigate was "triggered." Prouty ID at 24, 31-32, 34-35, 38. Under these circumstances, the agency has failed to persuade us that the administrative judge in *Prouty* erred in relying on *Miller* or that the administrative judge in *Weller* erred in applying those concepts to reach his result.

¶18 As stated, we agree with the administrative judges that applying *Miller* and/or its concepts to the facts of these cases does not result in a finding that the appellants are guilty of the wrongdoing as charged in connection with the 2010 WRC. However, it is clear that, in other situations, *Miller* can be relied upon as a basis for agencies to hold supervisors liable for improprieties engaged in by their subordinates. *See, e.g.*, *Miller v. Department of the Navy*, 11 M.S.P.R. 518, 521 (1982) (supervisory employee was properly held accountable for ignoring repeated blatant leave abuse by his subordinates under circumstances in which the employee should have known of the acts of his subordinates, aside from an alleged lack of uniformity within the agency in reporting leave during the relevant time frame). As the administrative judge in *Prouty* found, application of the "knowledge and acquiescence" standard under *Miller* requires consideration and a balancing of a number of factors which, under certain circumstances, will render supervisors responsible for the misconduct of their subordinates. Prouty ID at 26-27. The fact that the agency here did not meet the standard regarding

these appellants in no way suggests that agencies may not, in other situations, rely upon *Miller* to hold supervisors responsible for the misdeeds of their employees.

¶19     In its petitions for review, the agency cites *Dolezal v. Department of the Army*, 58 M.S.P.R. 64, 72 (1993), *aff'd*, 22 F.3d 1104 (Fed. Cir. 1994) (Table), as support for its position that members of the SES are held to a higher standard. Prouty PFR File, Tab 1 at 15; Weller PFR File, Tab 1 at 9.  It is true, as the agency contends, that the Board in *Dolezal* declared that the appellant must be "held to a higher standard of conduct because of his SES status and because his position made him [the Command's] highest-ranking personnel policy maker, and one of a handful of the highest-ranking personnel officers in the entire agency." 58 M.S.P.R. at 72.  That said, the misconduct of the SES appellant in *Dolezal* was wholly different from that alleged in these cases.  In addition, the Board in *Dolezal* did not need to, and therefore did not, address any specific duty on the part of SES members to investigate wrongdoing by their subordinates and so does not advance the agency's cause.  Notwithstanding, the overarching principle expressed in *Dolezal* to the effect that members of the SES, because of their status, are held to a higher standard of conduct remains valid.

¶20     We likewise find that the agency's reliance on *Baracker v. Department of the Interior*, 70 M.S.P.R. 594 (1996), is misplaced.  Again, it is true, as the agency argues, that the Board in *Baracker* held that "the SES is a corps of elite Federal managers held to a very high standard of conduct." *Id.* at 602.  The Board also cautioned in that case that SES employees could not be "insulated from discipline for behavior that would constitute actionable misconduct" in every instance, merely because it was "committed by a lower-graded employee." *Id.*  Nonetheless, our holding in *Baracker* does not, as the agency seems to suggest here, endorse the idea that an agency may relinquish its obligation to prove charges against an SES employee solely on the basis of his or her status.

¶21        We have considered the agency's challenges on review to the administrative judges' specific findings as to each specification but find them unavailing.  For example, regarding the first two specifications of the charge, the agency contends that the administrative judge erred in concluding that appellant Prouty had no actual knowledge of the expenditures for the WRC and no knowledge that should have triggered a duty to investigate.  Prouty PFR, Tab 1 at 17-18.  In support of its position, the agency challenges the credibility of appellant Prouty's hearing testimony that it would have been inappropriate to investigate how much was being spent on the WRC by Region 9.  *Id.*; *see* Prouty HT, Vol. 8 at 99-100 (testimony of appellant Prouty).  The agency cites the hearing testimony of the Region 7 PBS Regional Commissioner that, after the WRC was concluded and he knew of the OIG deficiency report, he obtained statistics from Region 9 related to the expenses of the conference, broken down by region.  Prouty PFR File, Tab 1 at 17; *see* Prouty HT, Vol. 8 at 31-32.  The agency contends that, if Region 7 was able to successfully obtain the cost data for the 2010 WRC from Region 9, then appellant Prouty also could have obtained the same information, determined that the costs of the 2010 WRC were excessive, and used the information to hold his SES peers accountable.  Prouty PFR, Tab 1 at 17-18.

¶22        Here, the administrative judge's findings on specifications 1 and 2 are based either on undisputed facts or, in significant part, on her assessment of the credibility of the hearing witnesses, including appellant Prouty.  *See, e.g.*, Prouty ID at 14-16.  In this regard, we note that the U.S. Court of Appeals for the Federal Circuit has ruled that the Board "is not free simply to disagree with an administrative judge's assessment of credibility."  *Chauvin v. Department of the Navy*, 38 F.3d 563, 566 (Fed. Cir. 1994).  Rather, the Board must give deference to an administrative judge's credibility determinations where, as here, they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing; the Board may overturn such determinations only when it

has "sufficiently sound" reasons for doing so.  *See Haebe v. Department of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002); *accord Walker v. Department of the Army*, 102 M.S.P.R. 474, ¶ 13 (2006).  We have thoroughly reviewed the hearing testimony and documentary evidence from below, and find that the agency has not presented sound reasons for us to revisit the administrative judge's credibility determinations in *Prouty* or her resultant findings and no basis upon which to disturb her determination that the agency failed to establish these specifications.  *See Yang v. U.S. Postal Service*, 115 M.S.P.R. 112, ¶ 12 (2010) (mere disagreement with the administrative judge's findings is insufficient to disturb the initial decision); *see also Broughton v. Department of Health & Human Services*, 33 M.S.P.R. 357, 359 (1987) (there is no reason to disturb the administrative judge's conclusions when the initial decision reflects that the administrative judge considered the evidence as a whole, drew appropriate inferences, and made reasoned conclusions).

¶23        With respect to specification 3, the agency contends that appellant Prouty should have been aware that funds for the conference were being spent on clothing (including $3,700 for t-shirts, for instance) because a contractor designed the branding on vests (to be worn underneath tuxedos for a formal event), which it contends were purchased in violation of agency policy.  Prouty PFR File, Tab 1 at 19.  The agency argues that, although appellant Prouty met with the contractor up to six times, he "never asked a simple question:  what projects are you working on?"  If he had, the agency contends, he would have been told that the contractor was designing clothing.  *Id.*  The contractor, however, never testified that he designed the branding for the vests or otherwise was involved in their acquisition and there is no record evidence that the vests, in fact, had branding on them.  *See* Prouty HT, Vol. 7 at 220-38 (testimony of the contractor).  The agency further contends that appellant Prouty was aware, or should have been aware, that clothing purchases were improper because he testified that he had been so informed by his own Regional Counsel, and Region 8

had a practice of not spending funds on clothing. Prouty PFR File, Tab 1 at 19. Although appellant Prouty testified that Region 8 had stopped using t-shirts because his Regional Counsel was uncomfortable with the agency practice of using t-shirts, he also testified that the use of t-shirts was widespread at the agency and that he was unaware that t-shirts were procured for the 2010 WRC. *See* Prouty HT, Vol. 9 at 56. Thus, appellant Prouty's testimony does not, as the agency alleges, constitute preponderant evidence that he should have been aware that funds were being spent on clothing in violation of agency policy.

¶24    As to the administrative judge's determination concerning the expenditures on the commemorative coins, the agency contends that she did not consider the testimony of the Regional Commissioners for Regions 7 and 10 that the coins were given to all employees in their regions without any assessment of their performance and without regard to the performance evaluations of the employees who received the coins. Prouty PFR File, Tab 1 at 20; *see* Prouty HT, Vol. 9 at 22-24, 69-69. It contends that the administrative judge should have concluded that an award that is putatively to recognize performance cannot be a bona fide performance award when it is given without any inquiry into or assessment of the recipient's performance. Prouty PFR File, Tab 1 at 20.

¶25    As with regard to specifications 1 and 2, the administrative judge's findings on specification 3 are based on undisputed facts, her assessment of the probative value of the hearing evidence and testimony, and her assessment of credibility of the hearing witnesses, including appellant Prouty. The record reflects that the administrative judge considered the record as a whole, and we find that her conclusions are supported by the record. Merely disagreeing with the administrative judge's findings and credibility determinations is insufficient to warrant reversing the administrative judge's decision. *Yang*, 115 M.S.P.R. 112, ¶ 12; *Broughton*, 33 M.S.P.R. at 359. We find no basis for disturbing the administrative judge's determination that the agency failed to establish this specification.

¶26     The agency contends on review that specification 4 should have been sustained because appellant Prouty had actual knowledge that the team building exercise involving the assembly of bicycles was being contemplated; he expressed concern about the exercise; and, although he was told by the Region 9 Regional Commissioner that Region 9 would get a legal opinion concerning the exercise, appellant Prouty never "followed up" and never asked his own Regional Counsel for a legal opinion.  Prouty PFR File, Tab 1 at 20.  We disagree.  The agency does not dispute that appellant Prouty and another Regional Commissioner raised the question of obtaining legal guidance prior to proceeding and that the Regional Commissioner for Region 9 later provided assurances that, after the March planning meeting, he obtained legal review for the activities prior to contracting.  Prouty ID at 37-38; *see* Prouty HT, Vol. 8 at 57, Vol. 9 at 49-51.  The agency has offered no persuasive reason to disturb the administrative judge's conclusion that it failed to establish that appellant Prouty had direct control over Region 9 employees committing the violation, triggering an affirmative duty to investigate, or that he in his supervisory capacity over subordinate employees "actually directed or had knowledge of and acquiesced in the misconduct" of the Regional Commissioner for Region 9 or his subordinate employees.  Prouty ID at 38.  Again, the administrative judge's findings and conclusions are firmly grounded in the record and so we must give them deference.

¶27     Similarly, as to the *Weller* case, the agency contends on review that the administrative judge made findings upon which he should have sustained the first specification but that he instead erroneously concluded that appellant Weller "had no responsibility because he had no actual knowledge of the matters cited above." Weller PFR File, Tab 1 at 15.  Again, the agency's contentions are based on an erroneous interpretation of the initial decision.  The administrative judge did not find that appellant Weller had no responsibility because he had no actual knowledge but rather that the agency simply failed to establish the allegations in this specification by preponderant evidence.  Weller ID at 4-5.  Thus, for

example, the administrative judge found that, although the agency alleged in this specification that appellant Weller had failed to control costs by permitting 70 employees from his region to attend the WRC, it provided no evidence or explanation as to why this number of conference attendees should be deemed untoward or excessive, Weller ID at 3, and the agency's petition for review provides no basis for disturbing this finding. Indeed, as the administrative judge noted, the only hearing testimony on this subject indicated, without challenge, that the 70 employees sent to the WRC from Region 7, out of a total number of approximately 700, was consistent with a formula applied to all participating regions since at least 2006. Weller ID at 4; Weller HT, Vol. 1 at 253 (testimony of the former Regional Commissioner for Region 10).

¶28    On review, the agency also contends that appellant Weller failed to meet with the employees that he had appointed to serve as representatives from Region 7 on the "planning team" for the WRC as would be expected of a member of the SES properly concerned with containing the costs of government. Weller PFR File, Tab 1 at 16. The agency does not dispute, however, that appellant Weller was several supervisory levels removed from these individuals and so he was not cognizant of the transgressions nor had any reasonable expectation to believe that the employees in Region 9 were engaging in wrongdoing. Weller ID at 5-6. We find no basis for disturbing the administrative judge's determination that appellant Weller's routine delegation of pre-conference planning to the Region 7 employees, such that he was unaware of the overall number and composition of onsite meetings, did not violate his fiduciary duties or otherwise constitute conduct unbecoming a federal employee. Weller ID at 6.

¶29    The administrative judge's findings that the authority for making logistical arrangements rested solely with the Regional Commissioner of Region 9 and his staff are based either on undisputed facts or the corroborated testimony of the hearing witnesses, including the appellant. Weller ID at 4; *see* Weller HT, Vol. I at 239-40, 251-53, 314-15, 324-26 (testimony of Regional Commissioners for

Regions 8 and 10); *see also id.*, Vol. II at 99-100 (testimony of appellant Weller). The agency has not presented sound reasons for us to revisit those findings. We have thoroughly reviewed the hearing testimony and documentary evidence from below, and find no basis for disturbing the administrative judge's determination that the agency failed to establish this specification. *See Yang*, 115 M.S.P.R. 112, ¶ 12; *see also Broughton*, 33 M.S.P.R. at 359.

¶30      Regarding the second specification, the agency contends on review, as it did below, that appellant Weller's participation at the conference itself placed him on notice of the lavish nature of what was provided and should have caused him to realize that per diem rates had been exceeded. Weller PFR, Tab 1 at 16-21. As the administrative judge correctly noted, however, this aspect of the agency's charge, while referenced in its decision letter, was not expressly included in the appellant's notice of proposed removal. Weller ID at 10; *see* Weller IAF, Tab 5 at 14. Thus, it was not appropriately considered as part of the charge. *See Gottlieb*, 39 M.S.P.R. at 609.

¶31      The agency also contends with respect to this specification that the administrative judge erred in failing to find that, had appellant Weller exercised his duty to inquire and inform himself, he would have learned that these expenditures were improper. Weller PFR File, Tab 1 at 19. The agency fails to cite any evidence or authority concerning the source or scope of such a duty. Further, the agency does not dispute the administrative judge's determination that the contract arrangements for the food and beverages served at the WRC were exclusively performed by employees of Region 9, that appellant Weller was not privy to this contracting process, and that he did not know what the government was actually charged for any of the catering arrangements at the WRC. Weller ID at 9. Under these circumstances, we find no basis in the agency's petition for review for disturbing the administrative judge's determination that it failed to establish this specification. *See Yang*, 115 M.S.P.R. 112, ¶ 12; *see also Broughton*, 33 M.S.P.R. at 359.

¶32    As to specification 3, the agency contends on review, as it did below, that appellant Weller is responsible, as a senior executive, for the actions or inactions of the employees he appointed to serve as representatives from Region 7, who became aware during the various planning meetings that at least some of these items would be procured for the WRC, and that he should either have kept sufficiently apprised via communication with these employees, or he should have ensured that they possessed the requisite knowledge to determine whether such purchases were permissible. Weller PFR File, Tab 1 at 21-24. The agency provides no basis, however, for disturbing the administrative judge's determination that appellant Weller selected these employees as planning representatives, and not for their knowledge of federal acquisition rules or to troubleshoot whether Region 9 was complying with them, and that it was the understanding of all involved that contract and procurement decisions for the WRC were to be made by Region 9, which remained solely responsible for them. Weller ID at 13-14. Accordingly, the agency's contentions in this regard do not provide a basis for disturbing the initial decision.

¶33    As it did in the *Prouty* case, the agency contends on review that, regarding the commemorative coins, the administrative judge should have concluded that an award that is putatively to recognize performance cannot be a bona fide performance award when it is given without any inquiry into or assessment of the recipients' performance and that, "apart from the assertions of the three Regional PBS Commissioners at the hearing, there was no evidence the coin was a bona fide award." Weller PFR File, Tab 1 at 20-23. As with specifications 1 and 2, the administrative judge's findings on specification 3 are based on undisputed facts and the testimony of the hearing witnesses, including appellant Weller. The record reflects that the administrative judge considered the record as a whole, and we find that his conclusions are supported by the record, *see Yang*, 115 M.S.P.R. 112, ¶ 12; *see also Broughton*, 33 M.S.P.R. at 359, and, as such, we find no basis

for disturbing the administrative judge's determination that the agency failed to establish this specification.

¶34     The agency contends on review, as it did below, that specification 4 should have been sustained because one of appellant Weller's designated representatives attended meetings at which the team building exercise was being contemplated. Weller PFR File, Tab 1 at 25. We disagree. The agency does not dispute that another Regional Commissioner raised the question of obtaining legal guidance prior to proceeding, and that the Regional Commissioner for Region 9 later provided assurances that, after the March planning meeting, he obtained legal review for the activities prior to contracting. Weller HT, Vol. I at 249-51 (testimony of Regional Commissioner for Region 10); *id.* at 338 (testimony of Regional Commissioner for Region 8); *id.*, Vol. II at 21 (testimony of appellant Weller). The agency has offered no persuasive reason to disturb the administrative judge's conclusion that it failed to establish that appellant Weller knew or had reason to know that excessive government funds were being expended on the bicycle exercise or that the exercise would result in improper donation of agency property. Weller ID at 38. The administrative judge's findings and conclusions are firmly grounded in the record.

¶35     In sum, we conclude that the agency's petitions for review provide no basis to disturb the administrative judges' well-supported findings and ultimate conclusions that the agency failed to establish its charges. There can be no doubt that the decisions that were made in the planning and carrying out of the 2010 WRC reflect a disregard of economy and a level of extravagance that have no place in government. However the agency, by abandoning its duty to produce evidence in support of its charges against the appellants, as the administrative judges found, simply did not prove that these particular appellants knew or had reason to know of these ill-advised planning and purchasing decisions until after the conference had concluded, at which time no action on their part would have been effective. We have set forth in this decision any number of matters upon

which the agency failed to meet its burden of proof. For example, the agency failed to submit into the record most of the evidence underlying the OIG's conclusions, any evidence as to the actual costs and expenses for employees' attendance at the dry run, any evidence that appellant Prouty or any Region 8 employee was involved in procuring food for the conference, any evidence that appellant Prouty knew that Region 9 engaged in improper procurement and contracting activities, any evidence showing that the number of conference attendees from Region 7 was excessive, and any evidence that appellant Weller was involved in procuring food for the conference. We do not speculate as to what the result might have been had the agency submitted sufficient evidence in support of its charges. We find only that it failed to do so.

¶36     As we have clearly held in the past, members of the SES, managers, and supervisors may be held responsible for the misdeeds of their subordinate employees, where appropriate. *See, e.g.*, *Hanna v. Department of Labor*, 80 M.S.P.R. 294 (1998) (finding that demotion was an appropriate penalty for a supervisor charged with not complying with the agency's policies and, even worse, encouraging his subordinates to do the same), *aff'd*, 18 F. App'x 787 (Fed. Cir. 2001). Similarly, as we have explained above, the principles of *Miller* remain applicable for this purpose in public sector cases, particularly where it is shown that supervisors have direct control over the employees committing the violation. *Miller*, 8 M.S.P.R. at 253. Agencies need not leave this to chance. They may include such managerial obligations in the position descriptions of supervisors, even SES supervisors, to make clear the extent of their responsibility over the actions of their subordinates. No change in statute is necessary to enhance the responsibilities of members of the SES or other managers.

¶37     In light of the record and the agency's arguments before us, we are constrained to agree with the administrative judges' decisions to reverse these removal actions.

ORDER

¶38 We ORDER the agency to cancel the appellants' removals and to restore them effective June 25, 2012. *See Kerr v. National Endowment for the Arts*, 726 F.2d 730 (Fed. Cir. 1984). The agency must complete this action no later than 20 days after the date of this decision.

¶39 We also ORDER the agency to pay the appellants the correct amount of back pay, interest on back pay, and other benefits under the Office of Personnel Management's regulations, no later than 60 calendar days after the date of this decision. We ORDER the appellants to cooperate in good faith in the agency's efforts to calculate the amount of back pay, interest, and benefits due, and to provide all necessary information the agency requests to help it carry out the Board's Order. If there is a dispute about the amount of back pay, interest due, and/or other benefits, we ORDER the agency to pay the appellants the undisputed amount no later than 60 calendar days after the date of this decision.

¶40 We further ORDER the agency to tell the appellants promptly in writing when it believes it has fully carried out the Board's Order and to describe the actions it took to carry out the Board's Order. The appellants, if not notified, should ask the agency about its progress. *See* 5 C.F.R. § 1201.181(b).

¶41 No later than 30 days after the agency tells the appellants that it has fully carried out the Board's Order, each appellant may file a petition for enforcement with the office that issued his respective initial decision in these appeals if the appellant believes that the agency did not fully carry out the Board's Order. The petition should contain specific reasons why the appellant believes that the agency has not fully carried out the Board's Order, and should include the dates and results of any communications with the agency. 5 C.F.R. § 1201.182(a).

¶42 For agencies whose payroll is administered by either the National Finance Center of the Department of Agriculture (NFC) or the Defense Finance and Accounting Service (DFAS), two lists of the information and documentation necessary to process payments and adjustments resulting from a Board decision

are attached.  The agency is ORDERED to timely provide DFAS or NFC with all documentation necessary to process payments and adjustments resulting from the Board's decision in accordance with the attached lists so that payment can be made within the 60-day period set forth above.

¶43　　　This is the final decision of the Merit Systems Protection Board in this appeal.  Title 5 of the Code of Federal Regulations, section 1201.113(c) (5 C.F.R. § 1201.113(c)).

NOTICE TO THE APPELLANTS
REGARDING YOUR RIGHT TO REQUEST
ATTORNEY FEES AND COSTS

You may be entitled to be paid by the agency for your reasonable attorney fees and costs.  To be paid, you must meet the requirements set out at Title 5 of the United States Code (U.S.C.), sections 7701(g), 1221(g), 1214(g) or 3330c(b); or  38 U.S.C.  § 4324(c)(4).    The  regulations  may  be  found  at  5 C.F.R. §§ 1201.201,  1202.202,  and  1201.203.    If  you  believe  you  meet  these requirements, you must file a motion for attorney fees WITHIN 60 CALENDAR DAYS OF THE DATE OF THIS DECISION.  You must file your attorney fees motion with the office that issued the initial decision on your appeal.

NOTICE TO THE APPELLANTS REGARDING
YOUR FURTHER REVIEW RIGHTS

You  have  the  right  to  request  review  of  this  final  decision  by  the United States Court of Appeals for the Federal Circuit.  You must submit your request to the court at the following address:

United States Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

The court must receive your request for review no later than 60 calendar days  after  the  date  of  this  order.    *See*  5 U.S.C. § 7703(b)(1)(A)  (as  rev.  eff. Dec. 27, 2012).  If you choose to file, be very careful to file on time.  The court

has held that normally it does not have the authority to waive this statutory deadline and that filings that do not comply with the deadline must be dismissed. *See Pinat v. Office of Personnel Management*, 931 F.2d 1544 (Fed. Cir. 1991).

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703) (as rev. eff. Dec. 27, 2012). You may read this law as well as other sections of the United States Code, at our website, http://www.mspb.gov/appeals/uscode/htm. Additional information is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11.

If you are interested in securing pro bono representation for your court appeal, you may visit our website at http://www.mspb.gov/probono for a list of attorneys who have expressed interest in providing pro bono representation for Merit Systems Protection Board appellants before the court. The Merit Systems Protection Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.


FOR THE BOARD:


_____
William D. Spencer
Clerk of the Board
Washington, D.C.

|  | **DFAS CHECKLIST**<br><br>**INFORMATION REQUIRED BY DFAS IN ORDER TO PROCESS PAYMENTS AGREED UPON IN SETTLEMENT CASES OR AS ORDERED BY THE MERIT SYSTEMS PROTECTION BOARD** |
|---|---|

AS CHECKLIST: INFORMATION REQUIRED BY IN ORDER TO PROCESS PAYMENTS AGREED UPON IN SETTLEMENT CASES

## CIVILIAN PERSONNEL OFFICE MUST NOTIFY CIVILIAN PAYROLL OFFICE VIA COMMAND LETTER WITH THE FOLLOWING:

1. Statement if Unemployment Benefits are to be deducted, with dollar amount, address and POC to send.

2. Statement that employee was counseled concerning Health Benefits and TSP and the election forms if necessary.

3. Statement concerning entitlement to overtime, night differential, shift premium, Sunday Premium, etc, with number of hours and dates for each entitlement.

4. If Back Pay Settlement was prior to conversion to DCPS (Defense Civilian Pay System), a statement certifying any lump sum payment with number of hours and amount paid and/or any severance pay that was paid with dollar amount.

5. Statement if interest is payable with beginning date of accrual.

6. Corrected Time and Attendance if applicable.

## ATTACHMENTS TO THE LETTER SHOULD BE AS FOLLOWS:

1. Copy of Settlement Agreement and/or the MSPB Order.

2. Corrected or cancelled SF 50's.

3. Election forms for Health Benefits and/or TSP if applicable.

4. Statement certified to be accurate by the employee which includes:

   a. Outside earnings with copies of W2's or statement from employer.
   b. Statement that employee was ready, willing and able to work during the period.
   c. Statement of erroneous payments employee received such as; lump sum leave, severance pay, VERA/VSIP, retirement annuity payments (if applicable) and if employee withdrew Retirement Funds.

5. If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.



**NATIONAL FINANCE CENTER CHECKLIST FOR BACK PAY CASES**

Below is the information/documentation required by National Finance Center to process payments/adjustments agreed on in Back Pay Cases (settlements, restorations) or as ordered by the Merit Systems Protection Board, EEOC, and courts.

1. Initiate and submit AD-343 (Payroll/Action Request) with clear and concise information describing what to do in accordance with decision.

2. The following information must be included on AD-343 for Restoration:

    a. Employee name and social security number.
    b. Detailed explanation of request.
    c. Valid agency accounting.
    d. Authorized signature (Table 63)
    e. If interest is to be included.
    f. Check mailing address.
    g. Indicate if case is prior to conversion. Computations must be attached.
    h. Indicate the amount of Severance and Lump Sum Annual Leave Payment to be collected. (if applicable)

## Attachments to AD-343

1. Provide pay entitlement to include Overtime, Night Differential, Shift Premium, Sunday Premium, etc. with number of hours and dates for each entitlement. (if applicable)

2. Copies of SF-50's (Personnel Actions) or list of salary adjustments/changes and amounts.

3. Outside earnings documentation statement from agency.

4. If employee received retirement annuity or unemployment, provide amount and address to return monies.

5. Provide forms for FEGLI, FEHBA, or TSP deductions. (if applicable)

6. If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.

7. If employee retires at end of Restoration Period, provide hours of Lump Sum Annual Leave to be paid.

NOTE: If prior to conversion, agency must attach Computation Worksheet by Pay Period and required data in 1-7 above.

The following information must be included on AD-343 for Settlement Cases: (Lump Sum Payment, Correction to Promotion, Wage Grade Increase, FLSA, etc.)
    a. Must provide same data as in 2, a-g above.
    b. Prior to conversion computation must be provided.
    c. Lump Sum amount of Settlement, and if taxable or non-taxable.

If you have any questions or require clarification on the above, please contact NFC's Payroll/Personnel Operations at 504-255-4630.